UNITED STATES DISTRICT COURT
MASSACHUSETTS

JOHN J. O'BRIEN and
ELIZABETH TAVARES,

      Plaintiffs,

v.

HON. ROBERT A. MULLIGAN (Ret.),

      Defendant.

Case No.19-11433

## **COMPLAINT AND JURY DEMAND**

### I. PARTIES

1. The Plaintiff, **JOHN J. O'BRIEN**, is an individual who at all times relevant resided within the Commonwealth of Massachusetts.

2. The Plaintiff, **ELIZABETH TAVARES**, is an individual who at all times relevant resided in the Commonwealth of Massachusetts.

3. The Defendant, **HON. ROBERT A. MULLIGAN (RET.)**, is an individual who at all times relevant resided in the Commonwealth of Massachusetts.

### II. JURISDICTION

4. This Honorable Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331.

5. This Honorable Court also has supplemental jurisdiction over this pursuant to 28 U.S.C. §1337.

### III. VENUE

6. Venue is proper with this Honorable Court as all parties reside or have a principal place of business in the Commonwealth of Massachusetts.

## IV. FACTUAL ALLEGATIONS

### A. John J. O'Brien

7. Pursuant to M.G.L. c. 276 §98, former Chief Justice of Administration and Management (the "CJAM") of The Massachusetts Trial Court (the "Trial Court"), Hon. John J. Irwin, Jr., appointed the Plaintiff, John J. O'Brien ("Mr. O'Brien"), as the Commissioner of Probation on December 2, 1997.

8. In 1993, prior to Mr. O'Brien's appointment, the Massachusetts Legislature amended §98 to eliminate the six (6) year term limit for the position of Commissioner, providing the Commissioner lifetime tenure in the position.

9. In 2001, pursuant to M.G.L. c. 276 §83, the Commissioner was given the exclusive authority to appoint probation officers within the Probation Department. Pursuant to M.G.L. c. 276 §83 and M.G.L. c. 211(b) §8, the CJAM retained the power to reject any such appointment if it was not done in accordance with the Trial Court Policies and Procedures Manual for the Probation Department. Prior to the passage of M.G.L. c. 276 §83, the CJAM possessed the exclusive hiring authority of probation officers.

10. In 2010, during an interview with *Commonwealth Magazine*, the Defendant, Robert A. Mulligan ("Judge Mulligan"), CJAM at the time, acknowledged the lifetime appointment of Mr. O'Brien as the Commissioner of Probation, stating that it was a, "unique situation in the court system."

11. Judge Mulligan was appointed as CJAM on October 1, 2003 and served in that position until July 2013.

12. Shortly after his appointment as CJAM in 2003, Judge Mulligan's communications and relationship with Mr. O'Brien grew increasingly contentious, to the point where Judge Mulligan refused to meet in person with Mr. O'Brien to discuss the Probation Department, instead sending only written correspondence.

13. The correspondence between Mr. O'Brien and Judge Mulligan demonstrated that Judge Mulligan took issue with Mr. O'Brien about, inter alia, Mr. O'Brien's communications directly with Massachusetts legislators, the Probation Department budget and the "transferability"[1] of appropriations within the Trial Court, and Mr. O'Brien's exercise of his exclusive appointment authority of probation officers under M.G.L. ch. 276 §83.

14. In early 2010, Mr. O'Brien learned that Judge Mulligan had asked for Mr. O'Brien's employee file to find something on him.

---

[1] "Transferability" allowed Mulligan to transfer appropriations in and out of the various Trial Court departments, including the Probation Department.

15. The version of M.G.L. c. 276 §98 applicable at the time Mr. O'Brien was Commissioner did not provide the CJAM or any other state official the power to terminate Mr. O'Brien. In 2012, after the Spotlight Article referenced below, the Massachusetts Legislature changed §98 so that the CJAM had the express power to terminate the Commissioner of Probation.

   **B. Elizabeth Tavares**

16. Ms. Tavares was hired by the Massachusetts Department of Probation in 1980 as a Probation Officer in the Taunton District Court and was promoted to Assistant Chief Probation Officer while working in the Taunton District Court.

17. In 1993, Ms. Tavares was appointed to the position of Chief Probation Officer with regional responsibilities. In 1995, Ms. Tavares was appointed Associate Legal Counsel to then Commissioner Don Cochran.

18. Shortly after Mr. O'Brien was appointed Commissioner of Probation in 1998, pursuant to M.G.L. c. 276 §98, he appointed Ms. Tavares as Deputy Commissioner in charge of the Programs Division, responsible for drug testing, community supervision, collaborating with the Office of Community Corrections, and the Electronic Monitoring Program.

19. In 2000, pursuant to pursuant to M.G.L. c. 276 §98, Ms. Tavares was appointed to the position of Second Deputy Commissioner and in 2008 she was promoted again to First Deputy Commissioner.

20. Ms. Tavares employment was governed by the Trial Court Employment Manual and she could only be terminated from her employment for cause.

21. While Ms. Tavares was working in the Probation Department, she worked on the Fugitive Safe Surrender Program involving the Boston Municipal Court, where Judge Charles Johnson was the Chief Justice. As part of the program, Ms. Tavares had several meetings with Judge Johnson.

22. After one of their meetings, Judge Johnson asked Ms. Tavares to stay and he discussed with her how Judge Mulligan and Judge Marshall were working in tandem to remove John O'Brien, Ms. Tavares, Francis Wall, and Steven Price from the Probation Department. Judge Johnson described Judge Mulligan's disdain for Mr. O'Brien. He described that, as a result, Ms. Tavares, Mr. Wall, and Mr. Price (Mr. O'Brien's closest advisors) would be collateral damage.

23. Judge Johnson also described for Ms. Tavares how the issue of patronage hiring throughout the Trial Court was a regular topic at Chief Justice meetings, attended by Judge Mulligan. Judge Johnson communicated that Judge Mulligan was well aware of the issue of patronage hiring throughout Massachusetts government and did nothing about it until he were able to use the issue to oust Mr. O'Brien.

### C. The Boston Globe Spotlight Article.

24. On Sunday May 23, 2010, The Boston Sunday Globe published a Spotlight Report titled "*Agency Where Patronage Is Job One*" ("the Spotlight Article").

25. The overall theme of the Spotlight Article was that Mr. O'Brien engaged in patronage during the hiring of Probation Department employees, specifically hiring and promoting individuals based on recommendations of politicians over other individuals that the Spotlight Article deemed more qualified.

26. The Spotlight Article described in detail the interpersonal issues between Judge Mulligan and Mr. O'Brien, including the Commissioner's exclusive hiring authority, the Probation Department budget, and O'Brien's communications with state legislators - - the same issues that Judge Mulligan had raised in his written correspondence with Mr. O'Brien.

27. The Spotlight Article also described in detail the theft of two (2) million dollars from the Lawrence District Court, despite the fact that the Probation Department had no control over, access to, or responsibility for monies kept in any Massachusetts courthouses.

28. Judge Mulligan knew the Probation Department had no control over, access to, or responsibility for monies kept in any of the courthouses yet provided a quote in the Spotlight Article on that issue, stating, "there was absolutely no oversight", referring to the Probation Department.

29. Prior to the release of the Spotlight Article, in a meeting between Judge Mulligan, Speaker of the Massachusetts House of Representative, Robert DeLeo, and DeLeo aide Lenny Mirasolo, Judge Mulligan instructed those in attendance to stay away from Mr. O'Brien because ,"this Lawrence thing is going to get him", referring to the two (2) million dollars stolen from the Lawrence District Court.

30. The day after the Spotlight Article, Monday May 24, 2010, Mr. O'Brien arrived at work and was given a letter from Judge Mulligan immediately suspending him from the position of Commissioner of Probation, specifically citing the Spotlight Article from the previous day as the sole reason for the suspension.

31. The letter that Judge Mulligan gave to Mr. O'Brien regarding his suspension states, "Please be assured that you will be provided the opportunity to present your case and respond to issues raised by the Special Master and Commissioner's review."

32. Judge Mulligan and Judge Margaret Marshall ("Judge Marshall") of the Supreme Judicial Court of Massachusetts ("SJC") issued a joint statement on May 24, 2010, the day after release of the Spotlight Article, in which they stated that the SJC, in conjunction with Judge Mulligan, had hired Attorney Paul Ware as Independent Counsel to investigate the Probation Department.

33. Attorney Ware was a former federal prosecutor with experience investigating high-profile criminal matters, including the Boston Central Artery tunnel collapse and the Iran-Contra scandal, two matters specifically referenced in the SJC's description of Attorney Ware's prior investigative experience.

34. Judge Mulligan was not acting in response to the Spotlight Article. Judge Mulligan, in a June 2010 interview with *Commonwealth Magazine*, admitted that he, Judge Marshall, the Boston Globe, and Attorney Ware were in contact prior to the release of the Spotlight Article.

35. The fact that criminal proceedings against Mr. O'Brien were being discussed amongst Judge Marshall, Judge Mulligan, and Attorney Ware was confirmed by Attorney Ware when he stated, during a Boston Globe interview on May 25, 2010, that he would be looking into whether, "civil or criminal action is warranted."

36. The Spotlight Article, about patronage hiring within a state agency, was less than a day old and Judge Mulligan, Judge Marshall, and Attorney Ware had already launched a criminal investigation of Mr. O'Brien and the Probation Department.

37. In the brief twenty-four (24) hour period between the Sunday Spotlight Article and when Mr. O'Brien arrived at work the following day, (1) Judge Mulligan had drafted and then delivered the letter of suspension to Mr. O'Brien, (2) the SJC had opened a judicial administration case, (3) a joint statement by Judge Mulligan and Judge Marshall was issued to the public, (4) the SJC issued an Order signed by all the SJC justices selecting Attorney Paul Ware as Independent Counsel, (5) and Mr. O'Brien's successor, Ronald Corbett, was named as Acting Commissioner.

38. Mr. O'Brien learned from the Human Resources Department of the Trial Court that Judge Mulligan's suspension letter to Mr. O'Brien was drafted on Friday May 22nd, two days before the release of the Spotlight Article.

39. Judge Marshall's late husband was a columnist and editor for decades at the New York Times, which at the time of the Spotlight Article owned the Boston Globe.

40. In a May 26, 2010 Boston Globe article following the Spotlight Article, State Senator Cynthia Creem, co-chair of the Senate Judiciary Committee was asked about possible changes to M.G.L. ch. 276 s. 98, the statute under which Mr. O'Brien was appointed commissioner, and Senator Creem responded, "We saw somebody with a lifetime appointment and no accountability".

**D. The Ware Investigation**

41. Judge Mulligan's complaints contained in his written correspondence with Mr. O'Brien mirrored the allegations found in the Spotlight Article, i.e. Mr. O'Brien communicating directly with Massachusetts legislators, the Probation Department budget and "transferability"[2] of appropriations within the Massachusetts Trial Court, and O'Brien's exercise of his exclusive appointment authority of probation officers under M.G.L. ch. 276 §83.

42. Judge Mulligan's dislike for Mr. O'Brien stemmed, not from a disagreement over Trial Court administration, but his disapproval of Mr. O'Brien's 2003 lawsuit against the Trial Court after former Judge Peter Anderson placed Mr. O'Brien in jail over his interpretation about drug testing of criminal defendants. After the lawsuit, Judge Mulligan viewed Mr. O'Brien from an adversarial perspective.

43. Meetings between Judge Mulligan and Mr. O'Brien weredifficult and uncomfortable. On occasion, Judge Mulligan attacked Mr. O'Brien's attitude and personality, exhibiting his personal dislike of Mr. O'Brien.

44. Judge Mulligan discussed with other Trial Court employees about working with Mr. O'Brien given his lifetime appointment. However, Judge Mulligan responded that the suggestion was not an approach that would work with Mr. O'Brien.

45. A key confidant that Judge Mulligan discussed his difficulties dealing with O'Brien was Judge Marshall.

46. Judge Mulligan utilized the only way to resolve the allegations contained in the Spotlight Article regarding Probation hiring against Mr. O'Brien in an attempt to return the appointing authority back to the CJAM, in other words, back to Judge Mulligan.

47. Pursuant to the Trial Court Policies and Procedures Manual, for any punishment beyond a written reprimand, Trial Court management employees are required to receive notice of the disciplinary charges being brought against them and are entitled to a hearing where the charges can be discussed with the employee and the employee is provided an opportunity to respond. The employee in these circumstances also has a right to appeal an adverse hearing decision to the Advisory Committee on Personnel Standards.

48. With respect to Attorney Ware's recommendation about criminal charges in his report, his first recommendation was federal charges against Mr. O'Brien and his deputies.

49. The Ware Report did more than refer the issue of patronage hiring at the Probation Department to the U.S. Attorney's Office. Attorney Ware provided a detailed legal

---

[2] "Transferability" allowed Mulligan to transfer appropriations in and out of the various Trial Court departments, including the Probation Department.

analysis in his report, comparing the allegations against Mr. O'Brien and Ms. Tavares with a recent 7th Circuit Chicago federal case involving patronage hiring. Attorney Ware's analysis and reliance on the single case ignored the established case law, as cited by the 1st Circuit Court of Appeals and available to Attorney Ware, that the Defendants' conduct was not a federal crime.

50. Following the release of the Ware Report, Judge Mulligan notified Mr. O'Brien that a disciplinary hearing, over which Judge Mulligan would preside, would be held.

51. Mr. O'Brien's counsel requested but was denied access to the complete Ware Report with exhibits that formed the basis for the hearing.

52. Mr. O'Brien's counsel asked that Judge Mulligan recuse himself from the hearing on account of his admitted animus towards Mr. O'Brien. Despite the fact that Judge Mulligan had previously testified that he was in a "constant battle" with Mr. O'Brien, who he openly described as "unprofessional" and "distasteful", Judge Mulligan refused to recuse himself.

53. On November 18, 2010, prior to any disciplinary hearing being afforded to Mr. O'Brien, the SJC released the following statement:

> The CJAM [Judge Mulligan] has informed the Justices that **he will immediately commence proceedings to terminate Commissioner of Probation John J. O'Brien** and that, acting in concert with the Acting Commissioner, he will immediately place on administrative leave First Deputy Commissioner Elizabeth V. Tavares, Deputy Commissioner Francis M. Wall, and Legal Counsel Christopher Bulger **pending the conclusion of disciplinary hearings, and that proceedings to discipline each of them, which discipline could include termination**, will commence immediately. (Emphasis Added).

54. According to the representations of Judge Mulligan to the SJC as reflected in the above statement, Judge Mulligan had already decided to terminate Mr. O'Brien as of November 18, 2010 and before he afforded Mr. O'Brien the disciplinary hearing or the Advisory Committee appeal to which he was entitled.

55. The November 18, 2010 statement from the SJC stated that, for Mr. O'Brien, proceedings were being commenced to terminate him. However, for Ms. Tavares, Mr. Wall and Mr. Bulger, they could be terminated but only after a disciplinary hearing. This establishes that Mr. O'Brien was being treated differently than any other Trial Court employees, including his own deputies, and in violation of M.G.L. ch. 276 §98.

56. As a result of Judge Mulligan's refusal to recuse himself from the disciplinary hearing despite his well-established bias against Mr. O'Brien, and his statement to the SJC that Mr. O'Brien was being terminated prior to any hearing taking place, Mr. O'Brien resigned from his position as Commissioner of Probation, effective December 31, 2010.

57. Following the release of the Ware Report in November of 2010, Acting Probation Commissioner Ronald Corbett placed Ms. Tavares on administrative leave for her alleged role in the patronage hiring within the Probation Department. A disciplinary hearing was scheduled for January 19, 2011.

58. Prior to the hearing, Ms. Tavares' then counsel, David R. Kerrigan, requested that the hearing be postponed indefinitely to await the results of the investigations being performed by the Office of the Massachusetts Attorney General and the Boston U.S. Attorney's Office. Doing so would have permitted Ms. Tavares the opportunity to provide a proper defense to the disciplinary changes.

59. Attorney Kerrigan also asked the Trial Court for a complete set of transcripts and exhibits generated during Paul Ware's investigation of the Probation Department.

60. Counsel for the Trial Court refused to provide Ms. Tavares with the requested information prior to the hearing and refused to postpone the hearing. Ms. Tavares also requested access to certain trial court employees and to have them appear at the hearing as part of her defense. Counsel for the Trial Court also denied this request.

61. Ms. Tavares requested a description from the Trial Court of how the disciplinary hearing would be conducted, the evidence that would be presented, and the identity of any witnesses that would be called to testify against her. She was also denied this information.

62. The only response that Ms. Tavares received from the Trial Court, through counsel Dan Sullivan, was that if Ms. Tavares appeared at the disciplinary hearing, she would be terminated.

63. Rather than appear at a closed-door disciplinary hearing in which she was denied a description of the charges against her, denied access to information necessary for her to respond to the charges and offer a defense at the hearing, and denied any information regarding how hearing was going to be conducted, Ms. Tavares resigned from her position.

### E. Judge Mulligan's Patronage Hiring

64. Estela Cordeiro, an administrative assistant in the Office of Court Management, submitted an affidavit during the federal criminal trial of Mr. O'Brien and Ms. Tavares (the "Cordeiro Affidavit").

65. The Cordeiro Affidavit described how, as part of her position, she maintained the database of all applicants for hire as court officers and associate court officers. The Cordeiro Affidavit described how the head of Court Security, Thomas Connolly, would provide her a list of candidates that indicated whether the applicant came from then Speaker of the House Sal DiMasi or then Senate President Robert Travaglini. The Cordeiro Affidavit described how Ms. Cordeiro asked Mr. Connolly where these lists came from and he told her Judge Mulligan's office.

66. For example, Judge Mulligan promoted SJC Judge Margaret Botsford's son-in-law to a court officer position in Dedham District Court in 2008 within days of Judge Botsfold voting for Judge Mulligan's re-appointment as CJAM. After Judge Mulligan received an anonymous letter questioning the timing of the promotion, he immediately rescinded the promotion, claiming it was not patronage.

67. When Judge Mulligan was garnering favor with politicians and state judges using court officer jobs; when he was speaking to the Boston Globe regarding Mr. O'Brien's patronage hiring; when he was drafting and delivering the letter of suspension to Mr. O'Brien; when he was communicating with the SJC regarding the Spotlight Article and taking action against Mr. O'Brien; when he was formulating and issuing the joint statement with Judge Marshall to the public; when he was naming a successor, Ronald Corbett, as Acting Commissioner; when he told the SJC on November 24, 2010 that he was terminating Mr. O'Brien without any hearing having been held - - Judge Mulligan knew at all of these times that he had also been engaging in widespread patronage, the same allegation he was making against Mr. O'Brien.

68. Judge Mulligan's continued patronage hiring of court officers in the Trial Court, without any discipline or reprimand, confirms that the communications among the Boston Globe, Judge Mulligan, and Paul Ware before and after the Spotlight Article were not intended to eradicate patronage hiring, they were meant to eradicate Mr. O'Brien and his deputies.

69. The November 18, 2010 statement from the SJC referenced above also stated that the Court was referring the findings of the Ware Report, an investigation into patronage hiring practices within in a state agency, to the U.S. Attorney's Office.

70. As set forth above, raising criminal charges against Mr. O'Brien and his deputies (but no other Trial Court or other state employees) for patronage hiring was being discussed by the Defendants, the SJC, and Attorney Ware (1) before the Spotlight Article, (2) in the days after the release of the Spotlight Article, (3) by Judge Mulligan and the SJC in November 2010 following the release of the Ware Report, and (4) and up until the Plaintiffs' indictment by the U.S. Attorney's Office.

71. On March 22, 2012, Mr. O'Brien, Ms. Tavares, and Deputy Commissioner William Burke were indicted in federal court for RICO conspiracy, Racketeering, and Mail Fraud related to the patronage hiring that was first described in the Spotlight Article.

72. On July 24, 2014, Mr. O'Brien, Ms. Tavares, and Mr. Burke were convicted of mail fraud, racketeering, and conspiracy to engage in racketeering.

73. On November 13, 2014, Mr. O'Brien was sentenced to eighteen (18) months and Ms. Tavares three (3) months in federal prison. They were each also fined $10,000.00. Mr. Burke received one (1) year of probation.

74. On December 19, 2016, Mr. O'Brien, Ms. Tavares, and Mr. Burke's convictions were overturned by the U.S. 1st Circuit Court of Appeals, with the Court stating in its opinion, "the Government overstepped its bounds in using federal criminal statutes to police the hiring practices of these Massachusetts state officials and did not provide sufficient evidence to a establish a criminal violation of Massachusetts law…".

## COUNT I – 42 U.S.C. §1983
## EQUAL PROTECTION

75. The Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the above paragraphs as if expressly set forth herein.

76. Equal protection claims under §1983 can be brought by a "class of one" where the plaintiff can demonstrate that he has been intentionally treated different from other similarly situated persons, that no rational basis exists for the difference in treatment, and that the difference in treatment was based on a malicious or bad faith intent to cause harm to the plaintiff.

77. Mr. O'Brien, by statute, was provided lifetime employment as the Commissioner of Probation and, therefore, was not an at-will employee, had a clear expectation of continuity in his employment, and had a property interest in the position.

78. The Defendant, Judge Mulligan knew of Mr. O'Brien's lifetime employment because when *Commonwealth Magazine* asked him about it, he responded that it was a "unique situation in the court system."

79. The co-chair of the Massachusetts Senate Judiciary Committee described to the Boston Globe how the Senate saw Mr. O'Brien as having a "lifetime appointment" under M.G.L. ch. 276 s. 98.

80. Ms. Tavares was appointed as Deputy Commissioner of Probation by statute and could only be removed from the position for cause pursuant to the applicable Trial Court Policies and Procedures Manual and as a result was not an at-will employee, had a clear expectation of continuity in her employment, and had a property interest in the position.

81. The conduct of the Defendant, as set forth in detail above, was all done under the color of law and done within his position as the CJAM. Such conduct deprived the Plaintiffs of their right to equal protection under the law.

82. The Defendant intentionally treated Mr. O'Brien and his deputies differently than any other Trial Court employee or Commonwealth of Massachusetts employee when he communicated with the Boston Globe about the Spotlight Articles prior to its release about patronage hiring in the Probation Department; suspended only Mr. O'Brien and his immediate deputies, for patronage hiring that was common practice in Massachusetts; and when he worked with the SJC to appoint Independent Counsel Paul Ware to investigate criminal charges against Mr. O'Brien and his deputies but did not take any action against any other Trial Court hiring authorities, including the Defendant Judge Mulligan himself, for patronage hiring. The Ware Report, initiated by the Defendant, which targeted only Mr. O'Brien and his deputies, led directly to the federal indictment and wrongful conviction of the Plaintiffs.

83. There was no rational basis for the different treatment that the Defendant gave to Mr. O'Brien and Ms. Tavares compared to other state employees, as shown by the fact that the Defendant, Judge Mulligan, and other Trial Court hiring authorities, also engaged in widespread patronage hiring but the Defendant did not investigate, suspend or otherwise discipline any other Trial Court employees, including the Defendant, Judge Mulligan. The Defendant's conduct as set forth above establishes the basis for the conduct was not to eradicate patronage or some other effort to reform the Trial Court. The Defendant's intention was to eradicate Mr. O'Brien and his deputies, and only them, from the Trial Court in violation of their right to equal protection under the law.

84. The Defendant's treatment of Mr. O'Brien and Ms. Tavares was due to a malicious and bad faith intent to have only their employment terminated due to the Defendant's deep personal animous toward Mr. O'Brien; to cause them harm via criminal charges and penalties; to have Mr. Corbett appointed as Acting Commissioner; and to have the power over the appointment authority for Probation Department employees returned to the CJAM, which Judge Mulligan admitted was his solution to the allegations against Mr. O'Brien.

85. The Defendant's malicious and bad faith intent is further shown by, inter alia (1) Judge Johnson's statement that Judge Mulligan intended to oust Mr. O'Brien from the Probation Department and was going to use patronage hiring as the basis for it; (2) the Defendant knowing that many other hiring authorities, including Defendant Judge Mulligan himself, engaged in patronage hiring but they only acted against Mr. O'Brien and his deputies; (3) the Defendant's use of the Boston Globe to target Mr. O'Brien and his deputies; (4) the Defendant initially claiming that their suspension of Mr. O'Brien and referral to a criminal investigation by Independent Counsel Ware was in response to the Spotlight Article when, in fact, the Defendant was admittedly working with the Boston Globe and Independent Counsel Paul Ware prior to the release of the Spotlight Article to

11

target Mr. O'Brien's office; and (5) the Defendant stating publicly that Mr. O'Brien would be terminated before his disciplinary hearing was held.

86. The Defendant's decision to only target Mr. O'Brien and his deputies for patronage hiring was a gross abuse of power and a fundamentally unfair procedure, as shown by the well-known and prevalent patronage hiring throughout the Commonwealth of Massachusetts and the Trial Court and the fact the Defendant, Judge Mulligan, himself engaged in the same patronage hiring as Mr. O'Brien, but only Mr. O'Brien and his deputies were targeted for suspension and termination. The unfairness of the procedure is also shown by the Defendant depriving Mr. O'Brien of a disciplinary hearing prior to deciding he would be terminated.

87. No other employee in the history of the Commonwealth of Massachusetts has been subjected to the treatment that the Defendant initiated against the Plaintiffs for hiring practices within a state agency, treatment that culminated in the now overturned federal conviction of the Plaintiffs. The Defendant targeted Mr. O'Brien and his deputies despite knowing that virtually all state employees and state agencies, including the Defendant, Judge Mulligan, were similarly situated as the Plaintiffs, all conducting patronage hiring for politicians and other state officials, but none were disciplined.

88. The Defendant, as a result of their conduct described above, has shown a reckless or callous indifference to the federally protected rights of the Plaintiffs.

89. The Plaintiffs have suffered monetary and emotional damages, impairment of reputation, humiliation, and mental anguish as a result of the Defendants conduct as described above, which caused their wrongful conviction that was ultimately overturned by the 1st U.S. Circuit Court of Appeals.

### COUNT II – 42 U.S.C. §1983
### PROCEDURAL AND SUBSTANTIVE DUE PROCESS

90. The Plaintiffs repeats, realleges, and incorporates by reference the allegations contained in the above paragraphs as if expressly set forth herein.

91. Mr. O'Brien, by statute, was provided lifetime employment as the Commissioner of Probation and, therefore, was not an at-will employee, had a clear expectation of continuity in his employment, and had a property interest in the position.

92. The Defendant, Judge Mulligan knew of Mr. O'Brien's lifetime employment because when *Commonwealth Magazine* asked him about it, he responded that it was a "unique situation in the court system".

93. The co-chair of the Massachusetts Senate Judiciary Committee described to the Boston Globe how the Senate saw Mr. O'Brien as having a "lifetime appointment" under M.G.L. ch. 276 s.98.

94. Ms. Tavares was appointed as Deputy Commissioner of Probation by statute and could only be removed from the position for cause pursuant to the applicable Trial Court Policies and Procedures Manual and as a result had a property interest in the position.

95. The Defendant, acting under the color of law in his position as CJAM, knowingly deprived Mr. O'Brien of his due process rights and property interest in the position of Commissioner of Probation, which he was expressly provided by statute, when he communicated his decision to terminate Mr. O'Brien in the November 2010 SJC Statement before Mr. O'Brien was provided a disciplinary hearing.

96. The Defendant, acting under the color of law in his position as CJAM, deprived Ms. Tavares of her due process rights and property interest in the position of Deputy Commissioner of Probation when he denied her a description of the charges against her, denied access to the information necessary for her to respond to the charges and offer a defense at the hearing, and denied any information regarding how the hearing was going to be conducted. The Defendant further deprived Ms. Tavares of her due process rights when he informed her, through counsel prior to the disciplinary hearing, that she would be terminated if she appeared at the hearing.

97. The Defendant, as a result of his conduct described above, has shown a reckless or callous indifference to the federally protected rights of the Plaintiff. The Defendant's conduct regarding Mr. O'Brien and Ms. Tavares' employment was arbitrary and capricious and a shocking abuse of government power that was not keyed to any legitimate government interest, it was solely aimed toward eliminating Mr. O'Brien and Ms. Tavares from the Probation Department.

98. The Plaintiffs have suffered monetary and emotional damages, impairment of reputation, humiliation, and mental anguish as a result of the Defendants conduct as described above, which caused their wrongful conviction that was ultimately overturned by the 1st U.S. Circuit Court of Appeals.

**COUNT III – 42 U.S.C. §1983**
**ABUSE OF PROCESS**

99. The Plaintiffs repeats, realleges, and incorporates by reference the allegations contained in the above paragraphs as if expressly set forth herein.

100. Mr. O'Brien, by statute, was provided lifetime employment as the Commissioner of Probation and, therefore, was not an at-will employee, had a clear expectation of continuity in his employment, and had a property interest in the position.

101.    The Defendant, Judge Mulligan knew of Mr. O'Brien's lifetime employment because when *Commonwealth Magazine* asked him about it, he responded that it was a "unique situation in the court system".

102.    The co-chair of the Massachusetts Senate Judiciary Committee described to the Boston Globe how the Senate saw Mr. O'Brien as having a "lifetime appointment" under M.G.L. ch. 276 s.98.

103.    Ms. Tavares was appointed as Deputy Commissioner of Probation by statute and could only be removed from the position for cause pursuant to the applicable Trial Court Policies and Procedures Manual and as a result had a property interest in the position.

104.    The Defendant, through his conduct as described in detailed above, caused the federal indictment and wrongful conviction of the Plaintiffs in federal court.

105.    The Defendant, as shown by his conduct described above, was acting with the ulterior motive and illegitimate purpose, confirmed by Judge Johnson, of targeting the Plaintiffs for removal from the Probation Department and using the well-known practice of patronage to do it; of having Ronald Corbett appointed as Acting Commissioner; and of having the hiring authority for Probation Department employees returned to the CJAM.  Nothing in the Defendant's conduct evidences a good-faith intent to eradicate patronage hiring anywhere else in the Trial Court or state government. To the contrary, the Defendant's conduct shows he intended to initiate a criminal investigation in order to have the Plaintiffs, and only the plaintiffs, removed from their positions and indicted for federal crimes, which led to the Plaintiffs' wrongful conviction in an attempt at self-engrandizement.

106.    The Plaintiffs have suffered monetary and emotional damages, impairment of reputation, humiliation, and mental anguish as a result of the Defendants conduct as described above, which caused their wrongful conviction that was ultimately overturned by the 1st U.S. Circuit Court of Appeals.

WHEREFORE, the Plaintiffs request that this Honorable Court enter the following:

1. Judgement in favor of the Plaintiffs on Count I and award compensatory damages, punitive damages, interest, and attorney's fees and expenses;

2. Judgement in favor of the Plaintiffs on Count II and award compensatory damages, punitive damages, interest, and attorney's fees and expenses;

3. Judgement in favor of the Plaintiffs on Count III and aware compensatory damages, interest, and attorney's fees and expenses.

**THE PLAINTIFFS CLAIM TRIAL BY JURY.**

        Respectfully submitted,
        John J. O'Brien and
        Elizabeth Tavares,
        By their attorney,

        _____/s/ Paul K. Flavin_____
        Paul K. Flavin, BBO# 171145
        Colucci, Colucci, Marcus & Flavin, P.C.
        424 Adams Street
        Milton, MA  02186
        (617) 698-6000
        pflavin@coluccilaw.com

Dated: 6/28/19

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.

        _____/s/ Paul K. Flavin_____